NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2437
_____

UNITED STATES OF AMERICA

v.

MICHAEL P. BERNICK,

Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-14-cr-00069-001)
District Judge: Honorable Arthur J. Schwab
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
May 18, 2016

Before: SMITH, HARDIMAN, and NYGAARD, *Circuit Judges*.

(Filed: June 6, 2016)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

HARDIMAN, *Circuit Judge*.

Michael Bernick was convicted of nine counts of bank embezzlement and sentenced to 144 months' imprisonment. He now claims the District Court erred by refusing to hold a hearing on his selective prosecution claim and by applying five sentencing enhancements. We will affirm.

I

Metropolitan Savings Bank (the Bank) was a small bank located in Pittsburgh. It consisted of one branch with space for two tellers, had approximately $1 million in capital, and was insured by the Federal Deposit Insurance Corporation (FDIC) for up to $100,000 per depositor. To manage the Bank's loan operations, its Board of Directors met each month to determine which loan applications to approve. On January 14, 2004, the Bank welcomed a new board member to its ranks, Michael Bernick. Throughout his tenure on the Board, Bernick served in multiple positions, including Treasurer.

At some point around his election to the Board, Bernick began a romantic relationship with Donna Shebetich—the Bank's manager, loan officer, and eventual Board Vice-President. Shebetich oversaw the Bank's day-to-day operations and helped disburse loans and complete the appropriate paperwork. About this time, Bernick also formed Keystone Residential Properties, LLC to facilitate his real estate business.

Starting in January 2005, Shebetich began disbursing Bank funds to Bernick, Keystone, and Bernick's creditors. Over the course of the next 14 months, Bernick was

2

the beneficiary of ten disbursements totaling $402,162.95. None of these disbursements had an accompanying promissory note or was approved by the Board, and only two were entered into the Bank's computer system. With few exceptions, Bernick made no repayments. Bernick also was linked to certain undocumented disbursements given to other individuals totaling more than a million dollars. Despite knowing of these undocumented disbursements, Bernick never disclosed them to the Bank's Board.

In early 2007, soon after the FDIC learned the Bank was insolvent, the Bank shut its doors, resulting in a loss of approximately $9.9 million, which was absorbed by the FDIC and twenty-four underinsured depositors. During its investigation of the Bank's closing, the FDIC discovered 56 undocumented disbursements accounting for nearly $2.5 million—over 200% of the Bank's capital. In an attempt to repair the damage caused by the Bank's failure, the FDIC held meetings with those who received the disbursements and asked them to sign proper loan documents. In the course of these meetings, the FDIC interviewed Bernick. When asked if he had ever taken a loan from the Bank, Bernick failed to mention his undocumented disbursements. Only after Bernick was confronted with evidence of his disbursements did he admit to obtaining them. Finally, Bernick refused to sign agreements to repay the money he had received.

In 2014, Bernick was indicted on ten counts of bank embezzlement under 18 U.S.C. § 656. Soon thereafter, he filed a motion to dismiss claiming selective prosecution. Bernick neither requested a hearing nor objected to the lack of a hearing after the District

Court denied his motion to dismiss. The case proceeded to trial and Bernick was found guilty on nine of the ten counts, resulting in a finding that he had embezzled $348,062.95 from the Bank.

At sentencing, the District Court calculated Bernick's offense level as 37, which included five sentencing enhancements: (1) 20 levels for causing a loss between $7 and $20 million; (2) two levels for committing a crime involving ten or more victims; (3) four levels for jeopardizing the safety of a financial institution; (4) two levels for abusing a position of trust; and (5) two levels for obstruction of justice. Under the United States Sentencing Guidelines (USSG), Bernick's offense level put his advisory sentencing range at 210–262 months' imprisonment. The Court granted Bernick a downward variance and imposed a sentence of 144 months' imprisonment for each count to run concurrently, five years' supervised release for each count to run concurrently, and restitution in the amount of $9,934,159.41.

## II[1]

Bernick makes two arguments on appeal: (1) it was reversible error for the District Court to deny his motion to dismiss for selective prosecution without a hearing; and (2) the Court erred in applying the five sentencing enhancements noted above.

---

[1] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

A

Because Bernick neither requested a hearing nor objected when the Court denied his claim without one, we review his argument that a hearing was necessary on his selective prosecution claim for plain error. Fed. R. Crim. P. 51; *United States v. Tai*, 750 F.3d 309, 313–14 (3d Cir. 2014).

To warrant a hearing, Bernick needed to show some credible evidence indicating he was selectively prosecuted. *United States v. Torquato*, 602 F.2d 564, 569–70 (3d Cir. 1979); *see also United States v. Hedaithy*, 392 F.3d 580, 607 (3d Cir. 2004) (discussing the related standard for granting discovery requests under *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). Bernick failed to meet this standard in two ways: (1) he did not show that someone similarly situated—a Director who received multiple undocumented disbursements and refused to sign promissory notes when confronted by the FDIC—was not prosecuted; and (2) he did not offer evidence that he was prosecuted on the basis of some unjustifiable ground, admitting that the reason he was prosecuted was "unknown to him." App. 34–35; *see United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989). Accordingly, we conclude the District Court committed no error, much less plain error, in denying Bernick's motion to dismiss without a hearing.

B

As for Bernick's sentence, his first and most important argument is that the District Court erred when it calculated a loss of approximately $9.9 million under USSG

§ 2B1.1(b)(1), which resulted in an increase of 20 levels to his base offense level. According to Bernick, he caused a loss of only $348,062.95—the value of the nine disbursements he was found guilty of embezzling.

Bernick's argument is unpersuasive because it ignores the fact that he can be held responsible for the over $9 million in losses sustained by the Bank as long as he knew or "should have known[] [such a loss] was a potential result of the offense." *See* USSG § 2B1.1 cmt. 3(A)(iv). As the District Court found, Bernick was a Director and at one time the Treasurer of the Bank; he took nine off-books disbursements totaling $348,062.95—over 30% of the Bank's capital; he made almost no payments on these disbursements; he was aware of similar disbursements made to others; and he did not inform the Board of any of the disbursements. *See* App. 630–31, 698. On these facts, it was foreseeable that taking such a large proportion of the Bank's capital without telling the Board would lead the Bank to fail, causing a loss of over $9 million. The District Court did not commit clear error by finding as much. *See United States v. Fountain*, 792 F.3d 310, 318 (3d Cir. 2015).

As Bernick acknowledges, his challenges to the next two sentencing enhancements are closely tied to the finding that he caused a loss of approximately $9.9 million. Specifically, he objects to his two-level enhancement for committing a crime involving ten or more victims, and his four-level enhancement for jeopardizing the safety of a financial institution. With regard to the first argument, we find no error because the loss

6

of $9.9 million was suffered by the FDIC and twenty-four individual depositors. *See* USSG § 2B1.1 cmt. 1 (defining "victim" as "any person who sustained any part of the actual loss determined under [the Guidelines]"). And by taking the undocumented disbursements and causing the Bank to fail, Bernick jeopardized the safety of the Bank by leading it to "insolven[cy]" and rendering it unable "to refund . . . deposit[s]," *see* USSG § 2B1.1(b)(16)(B)(i) & cmt. 13. There was no clear error in this regard either.

Bernick's fourth challenge relates to his two-level enhancement for abusing a position of trust in a manner that "significantly facilitated the commission or concealment" of his offense. *See* USSG § 3B1.3. He argues that since many others who were not Directors of the Bank received undocumented disbursements, it could not be the case that his directorship played a significant role in his receipt or concealment of his disbursements. The District Court disagreed with this analysis, finding that Bernick had "unfettered access" to disbursements and the ability to evade "control mechanisms" that were meant to prevent inappropriate loans from being granted. App. 634. We see no clear error here—by virtue of Bernick's position he easily gained access to Bank funds and, perhaps more importantly, concealed the existence of his disbursements (and those of others) by not reporting them to the Board.

Finally, Bernick objects to his two-level enhancement for obstruction of justice for testifying that he intended to repay the disbursements. Bernick claims this testimony was truthful and akin to statements frequently made by bankrupt debtors who are unable to

repay their loans. We disagree. Bernick was hardly a typical borrower. He received disbursements outside the normal loan process, he did not sign a single promissory note, and he made almost no repayments. Despite these actions, Bernick testified that he meant to repay the Bank all along. The jury found otherwise, determining that Bernick intended "to injure or defraud the bank," *Valansi v. Ashcroft*, 278 F.3d 203, 210 (3d Cir. 2002). Bernick's testimony as to this element of the crime cannot be reconciled with the jury's verdict. Accordingly, the District Court did not err in enhancing his sentence based on obstruction of justice. *See* USSG § 3C1.1 & cmt. 4(B).

## III

For the forgoing reasons, we will affirm Bernick's judgement of conviction and sentence.